No. 114,757

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

KERRY G.,
*Appellee*,

v.

STACY C.,
*Appellant.*

SYLLABUS BY THE COURT

Civil orders of protection are available under the Protection from Abuse Act when abuse as defined under the Act has occurred. For the purposes of the Act, any unwanted sexual contact causes bodily injury, one of the required elements of abuse under the Act.

Appeal from Harvey District Court; STEPHEN A. HILGERS, judge. Opinion filed December 9, 2016. Affirmed.

*Mary A. McDonald*, of McDonald Law LLC, of Newton, for appellant.

*Sara Zafar* and *Lowell C. Paul*, of Kansas Legal Services, of Wichita, for appellee.

Before HILL, P.J., BUSER and LEBEN, JJ.

LEBEN, J.: Stacy C. appeals the district court's decision to grant an order of protection against him and in favor of Kerry G., a woman he had dated. Stacy contends that there wasn't sufficient evidence of bodily injury to constitute abuse under the Protection from Abuse Act, K.S.A. 60-3101 *et seq.* But Kerry testified to Stacy's unwanted sexual contact with her—actions that would constitute rape under Kansas criminal law. The district court accepted Kerry's testimony, so we must as well—and any

unwanted sexual touching causes bodily injury under the Act, which our legislature has told us to construe to protect victims of domestic violence. K.S.A. 60-3101(b). We therefore affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Kerry filed her petition for an order of protection against Stacy on July 21, 2015. The district court held an evidentiary hearing on the petition on October 13, 2015. Kerry and Stacy both attended the hearing, but only Kerry testified.

She said that she had sought criminal charges against Stacy after three involuntary sexual encounters with him at her home. While Stacy was out on bond awaiting trial on those charges, she said she believed Stacy had violated the bond conditions forbidding him from having contact with her by attempting to contact her friend, following her part of the way home late one night, parking in front of her office, and standing outside the back door of her office. Kerry said she had filed her request for a protective order after this conduct.

In her testimony, Kerry described the three encounters with Stacy in detail. Kerry testified that on September 1, 2014, Stacy had come over to her house to comfort her— her dog had just died, and she had been through a series of deaths in the previous several months. Kerry let Stacy come into her house and allowed him to hug her. Kerry said that the next thing she remembered was waking up to Stacy performing oral sex on her with digital penetration and him pinning her legs down. She said she had repeatedly told Stacy to stop. When Stacy stopped to get a condom, she said she had become hysterical and told him no again. Stacy then left her house. Kerry could not account for the time between letting him into her house and waking up in bed.

2

Kerry admitted two exhibits into evidence related to the September 1 incident. The first was an e-mail from Stacy to Kerry, dated September 27, 2014. In it, Stacy said: "I was . . . wrong for taking advantage of you while you were sleeping . . . and should not treat you that way." The second was a text-message exchange between Kerry and Stacy. The exhibit shows a text message from Stacy to Kerry stating, "I take full responsibility for [t]hat time I woke you up that way but continued anyway with disregard."

Kerry testified that Stacy had come back to her house on October 14. She stated that he had been visibly upset and wanted to talk to her about getting back together. Kerry let him enter her house. Kerry could not recall how she ended up in bed, but she said that she had again woken up to Stacy performing oral sex on her.

Stacy's attorney asked questions related to Kerry's credibility, including her lapses in memory. Kerry admitted she could only recall "bits and pieces" of the October 14 encounter and had not fully remembered the encounter until noon the next day. She also admitted to having a prescription for Ambien, a sleeping pill, which she stopped taking in part because it caused her to forget things. She said she had taken Ambien on one of the dates she was complaining about. No one ever got Kerry to state what specific date she took Ambien, but she said that she had not taken it on September 1 and had not taken anything but her medication for hypothyroidism on September 1 and October 14.

Kerry recounted a third encounter that occurred on October 17. This time, she said that Stacy had come over to her house and appeared upset. Although she said she could only remember "bits and pieces" of that night too, she remembered talking with him on her couch. The next thing she remembered was again waking up to Stacy performing oral sex on her and pinning her down. On cross-examination, Kerry admitted she had only begun to recall "bits and pieces" of the October 17 encounter around a week after it happened, with more details coming back over time.

3

The district court found that abuse—as defined by the Protection from Abuse Act—had occurred with regard to the incidents of sexual conduct. The Protection from Abuse Act authorizes protection orders when abuse as defined in K.S.A. 60-3102(a) has occurred. For the purposes of this case, Kerry alleged—and the district court found—that Stacy had caused bodily injury to Kerry. The court said, "[I]f someone tells you to quit touching them and you continue to touch them, then this Court is going to find, particularly when it's of a sexual nature, that you are injuring their body." The court added, "I'm going to take any sexual contact . . . [that's] unwanted [as] an injury to someone else."

After concluding that abuse had occurred and announcing that an order of protection would be entered, the district court also commented on Kerry's memory of the events. Although the court referenced a "suppressed memory theory," it did not make any findings about such a theory, simply concluding that Kerry "remembers now and testified to" the abuse and that the court was finding that abuse had taken place based on that testimony:

> "Some argument was made that[,] when did the memory occur[?] The Court is aware of the suppressed memory theory that can occur to somebody. That you remember things later that you have suppressed for whatever reason. Whether they were suppressed because of trauma, being upset, whether they were drug-induced suppressions, whether the Ambien caused it, whether another substance would have caused that—but she remembers now and testified to that, that this is what happened.

> "And, therefore, I'm going to find that the abuse took place, that the restraining order should be in place and it will be for a period of one year . . . ."

The district court said that it had entered the protection order based on the events of sexual misconduct, not based on any of the claimed incidents of violating no-contact provisions of the bond in Stacy's pending criminal case.

4

Stacy has now appealed to this court, arguing that no abuse occurred and, accordingly, no protection order should have been issued.

ANALYSIS

Stacy argues on appeal that the evidence wasn't sufficient to show abuse, one of the required elements for a protective order under the Protection from Abuse Act. Abuse under the Act requires one or more acts defined as abusive "between intimate partners or household members." K.S.A. 60-3102(a). Kerry and Stacy had been in a dating relationship, and he concedes that the evidence showed that they had been intimate partners. But he argues that no credible evidence showed that he had "intentionally or recklessly caus[ed] bodily injury," the other requirement for showing abuse as applied to the facts of this case. See K.S.A. 60-3102(a)(1).

There really are two questions at issue here. First, was the evidence sufficient to show that Stacy committed unwanted sexual acts on Kerry? Second, and if so, does that constitute a "bodily injury" that's considered abuse under the Protection from Abuse Act?

We turn first to the sufficiency of the evidence showing that Stacy had committed the unwanted sexual acts. The district court concluded that he had done so based on Kerry's testimony. When the district court makes factual findings based on evidence it has heard, we look to see whether those factual findings are supported by substantial evidence, meaning evidence that a reasonable person could accept as sufficient to support a conclusion. *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 915-16, 157 P.3d 1109 (2007). We do not reweigh the evidence or make our own credibility determinations, and we generally view the evidence in the light most favorable to the party who prevailed in the district court. *Wentland v. Uhlarik*, 37 Kan. App. 2d 734, 736, 159 P.3d 1035 (2007); *Myers v. Myers*, No. 110,753, 2014 WL 3630575, at *2 (Kan. App. 2014) (unpublished

5

opinion). In the context of actions under the Protection from Abuse Act, our court has expressed strong reluctance to substitute our judgment for that of the district court judge who has heard the testimony, given the complicated and highly personal factual issues that are presented. See *Trolinger v. Trolinger*, 30 Kan. App. 2d 192, 197, 42 P.3d 157 (2001).

Substantial evidence supports the district court's finding that Stacy continued to touch Kerry sexually after she told him to quit: her testimony. She recounted this occurring on more than one occasion. And her testimony about the September 1 incident was corroborated by email and text messages from Stacy apologizing for "taking advantage of" Kerry "while [she] was sleeping" and "tak[ing] full responsibility for [t]hat time [he] woke [her] up that way but continued anyway with disregard."

Stacy suggests that we should find this evidence not sufficiently credible to support Kerry's claims because of the memory issues she admitted to and the district court's reference to "suppressed memory theory." He argues that the district court based its acceptance of Kerry's testimony on an inferred acceptance of suppressed memory theory without any evidence in support of such a diagnosis.

We do not read the district court's comment that way. While the court made what seems a side comment that it was aware of "the suppressed memory theory that can occur to somebody," it did not say that it was relying on such a theory in evaluating her testimony. The court concluded shortly after mentioning suppressed memory theory that "she remembers now and testified to that, that this is what happened." The court's next sentence, "And, therefore, I'm going to find that the abuse took place," indicated that the court had accepted her testimony and, based on it, concluded that "abuse took place."

To decide this case, we need not determine whether a district court in a similar situation could take into account accepted scientific information, assuming some exists,

6

on the ways in which memories might be suppressed and recovered. See K.S.A. 60-409(b)(3); Monahan & Walker, *A Judge's Guide to Using Social Science*, 43 Ct. Rev. 156, 162 (2007); Leben & Moriarty, *A Kansas Approach to Custodial Parent Move-Away Cases*, 37 Washburn L.J. 497, 524-32 (1998); Saks, *Judicial Attention to the Way the World Works*, 75 Iowa L. Rev. 1011 (1990). That's so because we find no indication that the district court here relied on such information. Only one witness—Kerry—testified at the hearing in this case. Not surprisingly in a one-witness case, the district court accepted that witness' testimony under the applicable evidentiary standard: that, more likely than not, events occurred as she testified. Her testimony provided substantial evidence in support of the district court's factual findings.

With that question answered, does unwanted sexual touching cause a "bodily injury" under the Protection from Abuse Act? It surely does.

Even Stacy makes little argument on this point, saying, "If sexual misconduct occurred, Appellant concedes it could support a finding of abuse under the statute . . . ." We will discuss the matter briefly, though, to give guidance to district courts that may face similar questions in later cases.

The term "bodily injury" generally means "[p]hysical damage to a person's body." Black's Law Dictionary 906 (10th ed. 2014). While one could theoretically ask whether sexual touching without consent causes "physical damage," we note that a great many sex offenses are defined in Kansas (as in other places as well) as "sexually violent crime[s]." See K.S.A. 2015 Supp. 22-4902(c). They are rightly considered to cause bodily injury under a Protection from Abuse Act that is to be "liberally construed to promote the protection of victims of domestic violence." K.S.A. 60-3101(b); see *Crim v. Crim*, 40 Kan. App. 2d 367, Syl. ¶ 1, 196 P.3d 375 (2008) (noting liberal-construction rule); *Palos v. Hernandez*, No. 106,202, 2012 WL 2620561, at *5-6 (Kan. App. 2012) (unpublished

opinion) (noting that requirement that victim suffer substantial pain or impaired physical condition applies only in context of parental discipline of a child).

In the case now before us, the events described by Kerry from the September 1 incident would meet the statutory definition of rape. See K.S.A. 2015 Supp. 21-5503(a)(1)(B) (defining rape to include knowingly engaging in sexual intercourse with a victim who does not consent because the victim is unconscious); K.S.A. 2015 Supp. 21-5501(a) (defining sexual intercourse to include any penetration of the female sex organ by any object); *Becker v. State*, 703 N.E.2d 696, 698 (Ind. App. 1998) (citing cases to support "the general, if not universal, rule that if a man has intercourse with a woman while she is asleep, he is guilty of rape because the act is without her consent"); *State v. Preston*, 581 A.2d 404, 409 (Me. 1990) (holding that crime of unlawful sexual conduct against an unconscious person applies to a person who was asleep). We recognize, of course, that the evidentiary hearing held in the Protection from Abuse Act case now before us was not a criminal trial; separate criminal charges were pending, and our record does not disclose how they were resolved. But in this civil proceeding, with its lesser standard for the burden of proof, Kerry proved facts that amount to rape as the law defines it. And that certainly qualifies as bodily injury under the Protection from Abuse Act. Rape is a serious and sexually violent crime in the Kansas Criminal Code; future cases may present facts constituting other types of sexual misconduct. In line with the directive to liberally construe the Act to protect victims of domestic violence, we conclude that *any* unwanted sexual touching would cause bodily injury for the purposes of the Act.

The district court's judgment is affirmed.